EOC:KMB:JGP
F. #2000R0263

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

    - against -

JONATHAN WINSTON,
JASON COHEN,
HUNTER ADAMS,
MICHAEL REITER,
GREGG ADAMS,
ALAN BERKUN,
JAMES BILA,
LEONARD BILA,
CHRISTIAN BLAKE,
BRIAN CARROLL,
JOSEPH DIGIROLAMO,
JONATHAN DONESON,
RUSSELL EHRENS,
LOUIS FACCHINI, JR.,
JOHN FERRARO,
DAVID HIRSCH,
DAVID LAVENDER,
ROBERT LISNOFF,
ROBERTO MANGIARANO,
JOSEPH MANNINO,
DAVID MARGULES,
DAVID PESSO,
ANTHONY SCALA and
ROBERT WINSTON,

            Defendants.

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 00-1248 (S-2)(NGG)
(T. 15, U.S.C.,
§§ 78j(b) and 78ff;
T. 21, U.S.C., § 853;
T. 18, U.S.C., §§ 371,
982, 1341, 1343,
1956(a)(1)(A)(i),
1956(a)(1)(B)(i),
1956(a)(2)(B)(i),
1956(h),
1957(a)(1)(A)(i),
2 and 3551 et seq.)

- - - - - - - - - - - - - - - -X

THE GRAND JURY CHARGES:

INTRODUCTION

The Brokerage Firms

1.    From approximately February 1994 through March 1998, First United Equities Corporation ("First United") was a broker-dealer of securities registered with the United States Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers, Inc. ("NASD"). First United's principal office was located at 300 Garden City Plaza, Suite 518, Garden City, New York. First United's other offices were located in New York, New York and in Woodbridge, New Jersey. First United underwrote initial public offerings of securities ("IPOs"), was a "market maker" in various securities, and offered a variety of brokerage services to retail customers. A "market maker" facilitates trading in a security by setting price quotations and holding themselves out as prepared to buy and sell certain quantities of the security for their own account. First United employed traders, who purchased and sold securities for First United's own accounts and assisted First United in making markets in securities. First United also employed stock brokers, also referred to as "registered representatives," who sold securities to clients of First United. First United employed as many as approximately 40 brokers.

2.    In or about October 1996, a group of individuals associated with First United formed AGS Financial Group, a broker-dealer of securities registered with the SEC and the NASD. AGS Financial Group's principal office was located at 208 South LaSalle Street, Suite 2059, Chicago, Illinois. AGS Financial Group also had an office located at 541 Lexington Avenue, New York, New York. AGS Financial Group was a "market maker" in various securities and offered a variety of brokerage services to retail customers. AGS Financial Group employed traders and stock brokers.

3.    On or about April 1, 1997, a group of individuals associated with First United formed Lexington Capital, a broker-dealer of securities registered with the SEC and the NASD. Lexington Capital's principal office was located at 1300 Veterans Memorial Highway, Hauppauge, New York. Lexington Capital was a "market maker" in various securities and offered a variety of brokerage services to retail customers. Lexington Capital employed traders and stock brokers.

4.    In or about August 1998, Lexington Capital changed its name to Preston Langley Asset Management, Inc. ("Preston Langley"), and continued to operate as a broker-dealer of securities registered with the SEC and the NASD. Preston Langley's principal office was re-located to 48 West 38th Street,

New York, New York. Preston Langley was a "market maker" in various securities and offered a variety of brokerage services to retail customers. Preston Langley employed traders and stock brokers. As a condition of its membership in the NASD, Preston Langley agreed that it would not solicit clients to purchase "penny stock securities." "Penny stock securities" are stocks that trade below $5.00, and are considered as a group to generally be more volatile and riskier investments than stocks trading at higher prices.

5. In or about January 1998, individuals associated with First United and Lexington Capital acquired Stockton Equities Group ("Stockton Equities"), a broker-dealer of securities registered with the SEC and the NASD. Stockton Equities' principal office was located at 707 Broadway, San Diego, California and its branch office was located at 1 World Trade Center, New York, New York. Stockton Equities was a "market maker" in various securities and offered a variety of brokerage services to retail customers. Stockton Equities employed traders and stock brokers.

6. In or about October 1998, individuals associated with First United acquired Montrose Capital Management Ltd. ("Montrose Capital"), a broker-dealer of securities registered with the SEC and the NASD. Montrose Capital's principal office

was located at 40 Wall Street, New York, New York.  Montrose

Capital was a "market maker" in various securities and offered a

variety of brokerage services to retail customers.  Montrose

Capital employed traders and stock brokers.

The Management of the Brokerage Firms

7.    From approximately February 1994 through March

1998, the defendants JONATHAN WINSTON and JASON COHEN were

registered with the NASD as principals of First United.  In this

capacity, JONATHAN WINSTON and JASON COHEN were authorized to

manage and supervise First United's traders and brokers.  The

defendant HUNTER ADAMS was an undisclosed and unregistered

principal of First United.  JONATHAN WINSTON, JASON COHEN and

HUNTER ADAMS managed First United, including its traders and

brokers.

8.    From approximately October 1996 through March

1998, the defendants JONATHAN WINSTON and HUNTER ADAMS, acting as

undisclosed and unregistered principals of AGS Financial Group,

managed and supervised AGS Financial Group and its traders and

brokers without being licensed by the NASD to do so.

9.    From approximately April 1997 through August

1998, the defendants HUNTER ADAMS, GREGG ADAMS and ROBERTO

MANGIARANO, acting as undisclosed and unregistered principals of

Lexington Capital, managed and supervised Lexington Capital and

its traders and brokers without being licensed by the NASD to do so.

10.   From approximately August 1998 through March 2001, the defendant ROBERT LISNOFF was a registered principal of Preston Langley.   Defendants GREGG ADAMS, CHRISTIAN BLAKE and JAMES BILA, acting as undisclosed and unregistered principals of Preston Langley, along with LISNOFF, managed and supervised Preston Langley and its traders and brokers without being licensed to do so by the NASD.   The defendant HUNTER ADAMS was also an undisclosed principal of Preston Langley.

11.   From approximately February 1998 through May 2001, the defendant JONATHAN DONESON was registered with the NASD as a principal of Stockton Equities.   From approximately May 1999 through October 1999, the defendant RUSSELL EHRENS was registered with the NASD as a principal of Stockton Equities.   As principals, DONESON and EHRENS were authorized to manage and supervise Stockton Equities' brokers.   The defendant ROBERTO MANGIARANO was an undisclosed and unregistered principal of Stockton Equities.   EHRENS was responsible for the day to day operations of Stockton Equities' New York branch office.   The defendants MANGIARANO and DONESON were responsible for the overall management of Stockton Equities' principal office in San

6

Diego.   The defendant HUNTER ADAMS was also an undisclosed principal of Stockton Equities.

12.   From approximately December 1998 through February 2001, the defendants JONATHAN WINSTON and ROBERT WINSTON were undisclosed and unregistered principals of Montrose Capital. ROBERT WINSTON managed and supervised Montrose Capital and its traders and brokers without being licensed to do so by the NASD.

The Defendants

13.   The defendant JONATHAN WINSTON, in addition to being a registered principal and owner of record of First United and an undisclosed principal of AGS Financial Group and Montrose Capital, was a registered representative of First United from approximately February 1994 through December 1997.   JONATHAN WINSTON was identified in filings with the NASD as Vice Chairman of First United.

14.   The defendant JASON COHEN, in addition to being a registered principal and owner of record of First United, was a registered representative of First United from approximately February 1994 through December 1997.   JASON COHEN was identified in filings with the NASD as Chairman of the Board of First United.

15.   The defendant HUNTER ADAMS, in addition to being an undisclosed principal of First United, Lexington Capital and

7

AGS Financial Group, was a registered representative of First
United from approximately June 1995 through December 1996.
HUNTER ADAMS was an associate of the Gambino Organized Crime
Family.

      16.   The defendant MICHAEL REITER was an associate of
the Gambino Organized Crime Family and a promoter of several
stocks of which First United was a market maker.

      17.   The defendant GREGG ADAMS is the brother of the
defendant HUNTER ADAMS and was a registered representative of
First United from approximately April 1995 through April 1997,
and a registered representative of Lexington Capital and Preston
Langley from approximately April 1997 through March 2001.  GREGG
ADAMS was an undisclosed owner of Lexington Capital and a
registered owner of Preston Langley.

      18.   The defendant ALAN BERKUN  was a registered
principal and owner of record of Lexington Capital and Marlowe &
Co., the predecessor company of Lexington Capital, and was a
registered representative of Lexington Capital and Preston
Langley from approximately April 1997 through January 1999.

      19.   The defendant CHRISTIAN BLAKE was a registered
representative of First United from approximately May 1995
through May 1997 and a registered representative of Lexington
Capital and Preston Langley from approximately August 1997

through March 2001.   While employed at Lexington Capital and Preston Langley, BLAKE acted in the capacity of a sales manager.

20.   The defendant JAMES BILA was a registered representative of First United from approximately June 1995 through April 1997 and a registered representative of Lexington Capital and Preston Langley from approximately April 1997 through March 2001.   While employed at Lexington Capital and Preston Langley the defendant JAMES BILA acted in the capacity of a sales manager.

21.   The defendant LEONARD BILA is the brother of the defendant JAMES BILA and was a registered representative of First United from approximately June 1995 through April 1997 and a registered representative of Lexington Capital and Preston Langley from approximately April 1997 through March 2001.

22.   The defendant BRIAN CARROLL was a registered representative of Lexington Capital and Preston Langley from approximately August 1997 through March 2001.

23.   The defendant JOSEPH DIGIROLAMO was a registered representative of Lexington Capital and Preston Langley from approximately August 1997 through March 2001.

24.   The defendant JONATHAN DONESON, in addition to being a registered principal and owner of record of Stockton

9

Equities, was a registered representative of Stockton Equities, from approximately February 1998 through May 2001.

25. The defendant RUSSELL EHRENS, in addition to being a registered principal of Stockton Equities, was a registered representative of Stockton Equities from approximately May 1999 through October 1999.

26. The defendant LOUIS FACCHINI, JR., was a registered representative of First United from approximately September 1995 through July 1996.

27. The defendant JOHN FERRARO was a registered representative of Montrose Capital from approximately December 1998 through May 2000.

28. The defendant DAVID HIRSCH was a registered representative of First United from approximately January 1995 through March 1998. While employed by First United, HIRSCH was identified in filings with the NASD as its Sales Manager.

29. The defendant DAVID LAVENDER was a registered representative of Stockton Equities, in its New York branch office, from approximately February 1999 through August 1999.

30. The defendant ROBERT LISNOFF, in addition to being a registered principal and owner of record of Preston Langley, was a registered representative of Lexington Capital and Preston Langley from approximately April 1997 through March 2001.

10

31.   The defendant ROBERTO MANGIARANO, in addition to being a undisclosed principal of Lexington Capital and Stockton Equities, was a registered representative of First United from approximately March 1995 through April 1997, a registered representative of Lexington Capital from approximately June 1997 through February 1998, and a registered representative of Stockton Equities, from approximately February 1998 through March 2001.

32.   The defendant JOSEPH MANNINO was a registered representative of First United from approximately March 1995 through April 1997 and a registered representative of Lexington Capital and Preston Langley from approximately May 1997 through May 2001.

33.   The defendant DAVID MARGULES was a registered representative of First United from approximately June 1997 through October 1997.

34.   The defendant DAVID PESSO was a registered representative of First United from approximately May 1995 through September 1996.

35.   The defendant ANTHONY SCALA was a registered representative of Stockton Equities, in its New York branch office, from approximately March 1999 through August 1999.

11

36.   The defendant ROBERT WINSTON is the brother of the defendant JONATHAN WINSTON and was a registered representative of First United from approximately April 1996 through November 1997 and was a registered representative and undisclosed principal of Montrose Capital from approximately December 1998 through February 2001.

The Fraud Scheme

37.   The defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER, GREGG ADAMS, ALAN BERKUN, JAMES BILA, LEONARD BILA, CHRISTIAN BLAKE, BRIAN CARROLL, JOSEPH DIGIROLAMO, JONATHAN DONESON, RUSSELL EHRENS, LOUIS FACCHINI, JR., JOHN FERRARO, DAVID HIRSCH, DAVID LAVENDER, ROBERT LISNOFF, ROBERTO MANGIARANO, JOSEPH MANNINO, DAVID MARGULES, DAVID PESSO, ANTHONY SCALA and ROBERT WINSTON, together with others, participated in a scheme to manipulate the market price of stock and stock warrants that traded on the NASDAQ National Market System ("NASDAQ"), the NASDAQ Small Capitalization stock market, the Over-the-Counter Bulletin Board stock market, the American Stock Exchange and the Philadelphia Stock Exchange, and engaged in other deceptive sales practices with respect to public consumers.

38.   From approximately August 1995 through August 1998, the defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS,

12

MICHAEL REITER, GREGG ADAMS and ROBERTO MANGIARANO, together with others, arranged for First United and Lexington Capital to acquire control over large blocks of stock and stock warrants of various thinly capitalized, start-up companies (hereinafter referred to as "First United House Stocks"). JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS, together with others, acquired shares of the House Stocks for little or no consideration, usually by paying kickbacks or prearranging trades with those who controlled the House Stocks. JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, REITER, GREGG ADAMS and MANGIARANO, together with others, owned and controlled their shares of First United House Stocks in accounts in names other than their own (referred to herein as "nominee accounts").

39.    From approximately February 1998 through March 2001, the defendants HUNTER ADAMS, GREGG ADAMS, ALAN BERKUN, JONATHAN DONESON, ROBERTO MANGIARANO and RUSSELL EHRENS, together with others, arranged for Preston Langley and Stockton Equities to acquire control over large blocks of stock of various thinly capitalized start-up companies (hereinafter referred to as "Preston Langley House Stocks"). HUNTER ADAMS, GREGG ADAMS, ROBERTO MANGIARANO and JONATHAN DONESON, and others, placed their shares of Preston Langley House Stocks in nominee accounts and sold them to customers of Preston Langley and Stockton Equities.

13

40.   From approximately April 1998 through February 2001, the defendants JONATHAN WINSTON and ROBERT WINSTON, together with others, acquired control over large blocks of stock of various thinly capitalized start-up companies (hereinafter referred to as "Montrose Capital House Stocks").   JONATHAN WINSTON, ROBERT WINSTON and others placed their shares of Montrose Capital House Stock in nominee accounts and sold them to customers of Montrose Capital.

41.   The First United House Stocks, each followed by the abbreviation used in connection with public trading of the stock, included, among others, the following:

a.   Ashton Technology Group, Inc., "ASTN" (hereinafter referred to as "Ashton");

b.   EquiMed, Inc., "EQMD" (hereinafter referred to as "EquiMed");

c.   IRT Industries, Inc., "IRTG" (hereinafter referred to as "IRT");

d.   Mama Tish's Italian Specialties, Inc., "MAMA" (hereinafter referred to as "Mama Tish's"); and

e.   National Medical Financial Services Corporation, "NMFS" (hereinafter referred to as "National Medical").

14

42.  The Preston Langley House Stocks, each followed by the abbreviation used in connection with public trading of the stock, included, among others, the following:

a.  Americom Networks International, Inc., "ANIW" (hereinafter referred to as "Americom"); and

b.  Global Eco-logical Services, Inc., "GBLE" (hereinafter referred to as "Global").

43.  The Montrose Capital House Stocks, each followed by the abbreviation used in connection with public trading of the stock, included, among others, the following:

a.  Osage Systems Group, Inc., "OSE" (hereinafter referred to as "Osage"); and

b.  Skynet Holdings Inc., "SKYN" (hereinafter referred to as "Skynet"); and

c.  CNE Technologies Inc., "CNFT" (hereinafter referred to as "CNFT").

44.  After acquiring control of the First United and Preston Langley and Montrose Capital House Stocks (hereinafter referred to collectively as "House Stocks"), the defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER, GREGG ADAMS, ALAN BERKUN, JAMES BILA, LEONARD BILA, CHRISTIAN BLAKE, BRIAN CARROLL, JOSEPH DIGIROLAMO, JONATHAN DONESON, RUSSELL EHRENS, LOUIS FACCHINI, JR., JOHN FERRARO, DAVID HIRSCH,

15

DAVID LAVENDER, ROBERT LISNOFF, ROBERTO MANGIARANO, JOSEPH MANNINO, DAVID MARGULES, DAVID PESSO, ANTHONY SCALA and ROBERT WINSTON, together with others, created artificial market demand for the purpose of inflating the price of House Stocks. Among other manipulative means, the defendants, together with others: (i) made and caused to be made materially false and fraudulent representations to retail customers in order to induce those customers to purchase House Stocks; (ii) used and caused to be used high pressure and deceptive sales tactics in order to induce retail customers to purchase House Stocks; (iii) paid and accepted excessive, undisclosed commissions and sales credits to recommend and sell House Stocks, including allocations of House Stock, cash payments, and other items of value; (iv) made and caused to be made unauthorized trades in retail customer accounts; (v) operated an unregistered branch office of First United in Woodbridge, New Jersey; (vi) authorized unregistered brokers and cold callers routinely to misrepresent to customers that they were registered brokers when selling House Stocks; and (vii) instituted, implemented and failed to reveal to retail customers a policy in which a sale of a House stock would be executed only if it could be "crossed" or matched with a purchase of the same stock by another customer.

16

45. The high pressure and deceptive sales tactics used by brokers at First United, Lexington Capital, Preston Langley, Stockton Equities and Montrose Capital included, among others, the following: (a) recommending a well-known and established non-House Stock to potential new customers to lure them to open an account and then inducing them to purchase House Stocks; (b) forecasting enormous returns on investments without a reasonable basis for doing so; (c) luring customers to buy or hold House Stocks by promising that the customer would be allowed to participate in future lucrative private placements, bridge loans and initial public offerings; and (d) verbally abusing customers who resisted advice to buy or hold House Stocks.

46. When the price of the First United House Stocks rose as a result of these unlawful techniques, the defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER, GREGG ADAMS, ROBERTO MANGIARANO, together with others, sold their shares of First United House Stocks at a substantial profit from nominee and other accounts to First United's and Lexington Capital's customers. First United and Lexington Capital also obtained a percentage of the proceeds of these sales of First United House Stocks and used this money to further the fraudulent scheme.

17

47.   When the price of the Preston Langley House Stocks rose as a result of these unlawful techniques, the defendants HUNTER ADAMS, GREGG ADAMS, ALAN BERKUN, JONATHAN DONESON, RUSSELL EHRENS and ROBERTO MANGIARANO, together with others, sold their shares of Preston Langley House Stocks at a substantial profit from nominee and other accounts to Preston Langley's and Stockton Equities' customers.   Preston Langley and Stockton Equities also obtained a percentage of the proceeds of these sales of Preston Langley House Stocks and used this money to further the fraudulent scheme.

48.   When the price of the Montrose Capital House Stock rose as a result of these unlawful techniques, the defendants JONATHAN WINSTON and ROBERT WINSTON, together with others, sold their shares of Montrose Capital House Stocks at a substantial profit from nominee and other accounts to Montrose Capital's customers.   Montrose Capital also obtained a percentage of the proceeds of these sales of Montrose Capital House Stocks and used this money to further the fraudulent scheme.

49.   The defendants and other participants in the scheme sought to maintain the price of the House Stocks held by the customers of First United, Lexington Capital, Preston Langley, Stockton Equities and Montrose Capital so that the scheme would go undetected and a large reservoir of their

18

customers could be solicited again in the future to purchase artificially inflated House Stocks.

50.    The defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER, GREGG ADAMS, ALAN BERKUN, JAMES BILA, LEONARD BILA, CHRISTIAN BLAKE, BRIAN CARROLL, JOSEPH DIGIROLAMO, JONATHAN DONESON, RUSSELL EHRENS, LOUIS FACCHINI, JR., JOHN FERRARO, DAVID HIRSCH, DAVID LAVENDER, ROBERT LISNOFF, ROBERTO MANGIARANO, JOSEPH MANNINO, DAVID MARGULES, DAVID PESSO, ANTHONY SCALA and ROBERT WINSTON, together with others, artificially maintained the price of the House Stocks by a variety of techniques designed to insulate the House Stocks from the adverse pressure of a lack of genuine market demand, which would cause the stock price to collapse. These techniques included, among others, the following: (a) using high-pressure tactics and materially false and misleading statements to persuade customers not to sell House Stocks; (b) failing to take and execute customer orders to sell House Stocks; (c) executing a sale of House Stocks only if it could be "crossed" or matched with a purchase of the same stock by another customer; (d) manipulating the order and timing of the execution of trades in the House Stocks; (e) threatening and causing bodily harm to brokers who would not further the fraudulent scheme by selling House Stocks to customers; and (f) threatening individuals with

19

bodily harm unless they ceased engaging in transactions that had the effect of causing the price of the House Stocks to decrease, such as "short-selling" the House Stocks. "Short-selling" is a means for selling stock that a seller does not yet own, but will purchase in the future, at a price at which the stock trades on that future date.

51. None of these manipulative techniques and unlawful sales practices was disclosed to customers at the time of their purchase of the House Stocks or thereafter because disclosure would have revealed the undesirability of the House Stocks and would have jeopardized the success of the fraudulent scheme.

52. As a result of the above-described fraudulent scheme, the defendants and other participants in the fraud scheme obtained tens of millions of dollars in profits.

The Stocks Involved in the Fraud Scheme

53. National Medical was a First United House Stock issued pursuant to an initial public offering on or about August 3, 1995, underwritten by First United and other securities firms (the "National Medical IPO"). The defendants JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS and others structured the National Medical IPO so that their undisclosed allocation of the company's shares was given or sold at a nominal cost to their own nominees,

20

to the nominees of favored First United brokers, and to other individuals affiliated with First United.

54.    Ashton was a House Stock issued pursuant to an initial public offering on or about May 5, 1996, underwritten by First United and other securities firms (the "Ashton IPO").  The defendants JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS and others structured the Ashton IPO so that their undisclosed allocation of the company's shares was given or sold at a nominal cost to their own nominees, to the nominees of favored First United brokers, and to other individuals affiliated with First United.

55.    Mama Tish's was a First United House Stock issued pursuant to an initial public offering on or about November 8, 1996 underwritten by First United, AGS Financial Group and other securities firms (the "Mama Tish's IPO").  The defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS and others structured the Mama Tish's IPO so that their undisclosed allocation of the company's shares was given or sold at a nominal cost to their own nominees, to the nominees of favored First United brokers, and to other individuals affiliated with First United.  A short while after the Mama Tish's IPO, the NASD halted trading in Mama Tish's stock and reversed all trades made in the stock.  Trading was never resumed in Mama Tish's stock.

56.    In or about January 1997, the defendants JONATHAN
WINSTON, JASON COHEN and HUNTER ADAMS and others acquired EquiMed
stock for free or at a nominal cost.    EquiMed's President, Chief
Executive Officer ("CEO") and majority shareholder was also the
founder and majority shareholder of National Medical.

57.    In or about February 1997, the defendant MICHAEL
REITER, together with others, provided IRT stock for free or at a
nominal cost to the defendants JONATHAN WINSTON, JASON COHEN,
HUNTER ADAMS, GREGG ADAMS and ROBERTO MANGIARANO and others to
enable First United and Lexington Capital to manipulate the price
of the stock through the unlawful techniques described above.    In
exchange for the IRT stock, JONATHAN WINSTON, JASON COHEN, HUNTER
ADAMS, GREGG ADAMS, MANGIARANO and others agreed to pay REITER
and others a portion of the profits that were received from the
sale of IRT stock.    JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS
and others paid REITER and others their portion of the profits
through pre-arranged trades in IRT stock in the account of a
company called Apollo Equities Trading Corporation ("Apollo") and
others.    REITER received his portion of the profits by check from
the Apollo account.

58.    In or about May 1998, the defendants HUNTER ADAMS
and GREGG ADAMS, together with others, acquired Americom stock at
a nominal cost and placed it into nominee accounts to enable

22

Preston Langley and Stockton to manipulate the price of the stock through the unlawful techniques described above. At the time, Americom was a "Penny Stock," and as such, the NASD had forbidden Preston Langley from soliciting their clients to purchase it. In order to evade this restriction, HUNTER ADAMS, GREG ADAMS and others artificially inflated the price of Americom stock to approximately $5.00 per share, so Preston Langley could solicit their clients to purchase Americom shares. HUNTER ADAMS, GREG ADAMS and others accomplished this manipulation by means which included the following: (a) creating the appearance of market demand by bidding for and purchasing Americom stock for nominee accounts at Salomon Smith Barney and M.J. Whitman; and (b) pre-arranging transactions with other broker-dealers.

59. In or about and between February 1999 and August 1999, both dates being approximate and inclusive, the defendants HUNTER ADAMS, GREGG ADAMS, ALAN BERKUN, JONATHAN DONESON, RUSSELL EHRENS and ROBERT MANGIARANO, together with others, acquired secret control of Global stock at a nominal cost and placed it in nominee accounts to enable Preston Langley and Stockton to manipulate the price of the stock through the unlawful techniques described above.

60. In or about April 1998, the defendants JONATHAN WINSTON and ROBERT WINSTON, together with others, acquired secret

23

ROBERTO MANGIARANO, together with others, laundered tens of millions of dollars of proceeds of securities, mail and wire fraud with the intent to promote their fraudulent scheme and to conceal and disguise the nature, location, source, ownership and control of such proceeds.

64.   One of the techniques the defendants JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS and others used to launder money was to accumulate profits from the fraudulent scheme in a nominee account at First United in the name of Antebe Investment Group Ltd., and then to transfer the proceeds in this account to overseas bank accounts.

65.   The defendants JONATHAN WINSTON and JASON COHEN and others also employed the technique of laundering money by accumulating profits from the fraudulent scheme in JONATHAN WINSTON'S and JASON COHEN'S brokerage account at Smith Barney, account number 359-22655-10, and then transferring the proceeds in this account to themselves and others involved in the scheme, including the defendant HUNTER ADAMS, and to First United's trading, collateral and bank accounts to fund First United's brokerage activities.

66.   Another technique the defendant JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS and ROBERTO MANGIARANO and others used to launder money was to establish nominee accounts at First

United, such as in the names of E.M.R.A Investment Group Ltd. ("E.M.R.A."), Univest Group Ltd. ("Univest"), and Avalon Financial LLC ("Avalon"), in order to disguise their ownership of certain Ashton securities and other House Stocks, sell the secretly owned Ashton securities and House Stocks to customers and then transfer the proceeds in these accounts to themselves and to accounts that they controlled.

67.   The defendants JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS, together with others, also laundered money by entering into undisclosed pre-arranged transactions with Apollo, relating to National Medical, EquiMed, Ashton and IRT securities, in order to generate profits in Apollo's First United account for payment to the defendant MICHAEL REITER and others.  These transactions were undertaken in order to compensate REITER and others for assisting the fraud scheme by, among other things, facilitating the transfer of clients from A.R. Baron & Co, Inc. ("A.R. Baron") to First United and providing IRT stock for free or at a nominal cost.

68.   The defendant HUNTER ADAMS also laundered money by establishing nominee accounts at Pacific International Securities ("Pacific"), a broker-dealer based in Vancouver, Canada, in order to disguise his ownership of certain Americom and Global securities, sell the secretly owned securities to customers and

26

then transfer the proceeds in these accounts to himself and to
accounts that he controlled.

69.    The defendants HUNTER ADAMS, GREGG ADAMS and ALAN
BERKUN and others also laundered money by accumulating profits
from the fraudulent scheme in brokerage accounts at Gruntal &
Co., in the name of EJR Associates, and at Patterson Travis Inc.,
in the names of BERKUN and EJR Associates, and then transferring
the proceeds in these accounts to themselves and others involved
in the scheme.

70.    The defendants HUNTER ADAMS and ALAN BERKUN also
laundered money by accumulating profits from the fraudulent
scheme in accounts at Chase Manhattan Bank and HSBC, in the names
of BERKUN and EJR Associates, and then transferring the proceeds
in these accounts to foreign bank accounts.

71.    The defendant ALAN BERKUN also laundered money by
accumulating the profits from the fraudulent scheme in an account
in his name at Chase Manhattan Bank, and then using the proceeds
to purchase rare collectible stamps.

72.    The defendant JONATHAN WINSTON also laundered
money by establishing nominee accounts, in the name of Fincord
Holding Co. Inc., at Bear Stearns Securities Corp., Quick &
Reilly, and Founders Equity Securities, Inc. ("Founders Equity"),
all broker-dealers registered with the SEC and NASD, in order to

disguise and conceal his ownership of certain Osage, Skynet and CNFT securities; to sell the secretly owned securities to customers; and then to transfer the proceeds in these accounts to other accounts that he controlled.

73.    The defendant JONATHAN WINSTON also laundered money by accumulating profits from the fraudulent scheme in accounts at Commercial Bank of New York, in the name of Fincord Holding Co. Inc. ("Fincord"), and then transferring the proceeds in these accounts to himself and others involved in the scheme.

<u>COUNT ONE</u>
(Conspiracy to Commit Securities, Mail and Wire Fraud)

74.    The allegations contained in paragraphs 1 through 73 are realleged and incorporated herein.

75.    In or about and between February 1994 and March 2001, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER, GREGG ADAMS, ALAN BERKUN, JAMES BILA, LEONARD BILA, CHRISTIAN BLAKE, BRIAN CARROLL, JOSEPH DIGIROLAMO, JONATHAN DONESON, RUSSELL EHRENS, LOUIS FACCHINI, JR., JOHN FERRARO, DAVID HIRSCH, DAVID LAVENDER, ROBERT LISNOFF, ROBERTO MANGIARANO, JOSEPH MANNINO, DAVID MARGULES, DAVID PESSO, ANTHONY SCALA and ROBERT

WINSTON, together with others, did knowingly and willfully conspire:

a. directly and indirectly, to use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants, together with others, did knowingly and willfully conspire, directly and indirectly, to (1) employ devices, schemes, and artifices to defraud; (2) make untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of the securities, and by use of the means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff;

b. to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice and attempting to do so, to cause to be sent and delivered by the Postal Service,

29

and by private or commercial interstate carrier, and to take and receive therefrom, such matter and thing, according to the directions thereon, and cause to be delivered by mail or such carrier according to the direction thereon, and at the place at which it is directed to be delivered, certain matters and things, in violation of Sections 1341 of Title 18, United States Code; and

c. to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice and attempting to do so, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, signs, signals, and sounds, in violation of Sections 1343 of Title 18, United States Code.

76. In furtherance of the conspiracy and to effect the objects there of, within the Eastern District of New York and elsewhere, the defendants named herein, together with others, did commit and cause to be committed the following overt acts, among others:

## OVERT ACTS

a. In or about and between and June 1995 and May 2, 1996, the defendants JONATHAN WINSTON, JASON COHEN and HUNTER

30

ADAMS, together with others, arranged for Ashton warrants to be
placed in nominee accounts at First United.

   b.   On or about May 7, 1996, the defendants
JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS, together with
others, caused Antebe to purchase 45,000 Ashton Units, each of
which consisted of one share of stock and one warrant, at a price
of approximately $4.75 per unit.

   c.   On or about May 8, 1996, the defendants
JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS, together with
others, caused Antebe to sell 45,000 shares of Ashton stock at a
price of approximately $7.625 per share.

   d.   On or about May 8, 1996, a co-conspirator
caused to be mailed to a First United customer ("Customer No. 1")
a confirmation regarding that customer's purchase of
approximately 10,000 shares of Ashton stock.

   e.   On or about May 29, 1996, the defendants
JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS, together with
others, caused Antebe to sell 45,000 Ashton warrants at a price
of approximately $8.375 per warrant.

   f.   On or about August 26, 1996, two co-
conspirators caused a purchase of approximately 10,000 shares of
National Medical stock at a price of approximately $10.625 per

31

share to be made in the account of a First United customer ("Customer No. 2").

       g.   In or about September 1996, the defendant ROBERTO MANGIARANO refused to sell shares of National Medical as instructed by a First United customer ("Customer No. 3").

       h.   On or about November 11, 1996, the defendant JAMES BILA and a co-conspirator caused to be mailed to a First United customer ("Customer No. 4") a confirmation regarding that customer's purchase of approximately 25,000 shares of Ashton stock.

       i.   In or about March 1997, the defendants HUNTER ADAMS, GREGG ADAMS, JAMES BILA, LEONARD BILA, CHRISTIAN BLAKE, JONATHAN DONESON, ROBERTO MANGIARANO and JOSEPH MANNINO, together with others, met in Bayside, Queens, and discussed leaving First United to purchase or form their own broker-dealer of securities.

       j.   On or about  March 31, 1997, the defendant HUNTER ADAMS, together with others, caused approximately $180,000 to be transferred from accounts he controlled at GreenPoint Bank and Chase Manhattan Bank to an account at Citibank in the name of a nominee.

       k.   On or about April 2, 1997, the defendant HUNTER ADAMS, together with others, caused approximately $180,000

32

to be wired from a nominee account at Citibank to the defendant ROBERTO MANGIARANO's account at the Bank of New York.

l.   On or about April 3, 1997, defendant ROBERTO MANGIARANO, together with others, caused a certified check to be issued to purchase Marlowe & Co., a broker-dealer of securities, which later became Lexington Capital.

m.   In or about April 1997, the defendants HUNTER ADAMS, GREGG ADAMS, JAMES BILA, LEONARD BILA, CHRISTIAN BLAKE, JONATHAN DONESON, ROBERTO MANGIARANO and JOSEPH MANNINO, together with others, met in Uniondale, New York and discussed the formation of Lexington Capital.

n.   On or about June 20, 1997, the defendant JAMES BILA caused to be mailed to a Lexington Capital customer ("Customer No. 5") a confirmation regarding that customer's purchase of approximately 5,000 shares of IRT stock at a price of approximately $5.875 per share.

o. On or about July 7, 1997, the defendant ROBERTO MANGIARANO made a telephone call from Lexington's Hauppauge, New York, office to a Lexington Capital customer ("Customer No. 6") in Ohio and induced that customer to purchase approximately 40,000 shares of IRT stock at a price of approximately $5 per share.

33

p. On or about July 31, 1997, the defendant DAVID MARGULES and a co-conspirator caused to be mailed to a First United customer ("Customer No. 7") a confirmation regarding that customer's purchase approximately 11,000 shares of IRT stock.

q. On or about June 25, 1998, the defendant HUNTER ADAMS caused a nominee to purchase approximately 200 shares of Americom at a price of approximately $4.00 per share in the nominee's account at Salomon Smith Barney. .

r. On or about June 26, 1998, the defendant HUNTER ADAMS caused a nominee to purchase approximately 1,000 shares of Americom at a price of approximately $4.00 in the nominee's account at M.J. Whitman.

s. On or about June 26, 1998, the defendant HUNTER ADAMS caused a nominee to purchase approximately 500 shares of-Americom shares at a price of approximately $5.00 in the nominee's account at Salomon Smith Barney.

t. On or about July 6, 1998, the defendant HUNTER ADAMS caused approximately 112,000 shares of Americom to be deposited into a nominee's account at Pacific.

u. In or about July 1998, the defendants HUNTER ADAMS, GREGG ADAMS and ALAN BERKUN, together with others, met at ALAN BERKUN's 17 State Street, New York, New York, office and

34

discussed the deposit of Americom stock in accounts maintained and controlled by BERKUN.

v.   On or about July 7, 1998, the defendants HUNTER ADAMS and ALAN BERKUN caused approximately 96,000 shares of Americom that were held in the name of a nominee to be transferred to BERKUN.

w.   On or about October 14, 1998, the defendant JONATHAN WINSTON and a co-conspirator caused approximately 10,000 shares of Osage stock to be purchased at a price of approximately $5.91 in the Fincord account at Glenn Michael.

x.   On or about February 19, 1999, the defendant HUNTER ADAMS caused approximately 200,000 Global shares to be deposited into a nominee's account at Pacific.

y.   On or about April 28, 1999, the defendant ALAN BERKUN caused approximately 62,000 shares of Global to be sold at a price of approximately $6.00 per share from BERKUN's Gruntal Account to Preston Langley's trading account.

z.   On or about May 13, 1999, the defendant GREGG ADAMS and a co-conspirator caused a purchase of approximately 50,000 shares of Global stock at a price of approximately $7.50 per share to be made in the account of a Preston Langley customer ("Customer No. 8").

aa.   On or about August 24, 1999, a co-conspirator caused a purchase of approximately 10,000 shares of Americom stock at a price of approximately $10.12 per share to be made in the account of a Stockton Equities customer ("Customer No. 9").

bb.   In or about October 1999, the defendant ROBERT WINSTON caused a purchase of approximately 10,000 shares of Skynet stock at a price of approximately $7.75 per share to be made in the account of a Montrose customer ("Customer No. 10").

cc.   On or about December 22, 1999 and December 23, 1999, the defendant JONATHAN WINSTON caused approximately 186,000 shares of Skynet stock at a price range of approximately $7.25 to $7.71 per share to be sold from Fincord's account at Bear Stearns.

dd.   On or about December 23, 1999, the defendant ROBERT WINSTON caused a purchase of approximately 104,000 shares of Skynet stock at a price of approximately $7.69 to $7.75 per share to be made in the account of a Montrose customer ("Customer No. 11").

ee.   On or about January 18, 2000, the defendants ROBERT WINSTON and JOHN FERRARO caused a purchase of approximately 7,500 shares of Skynet stock at a price of approximately $7.81 per share to be made in the account of a Montrose Capital customer ("Customer No. 12").

36

ff.    On or about January 26, 2000, the defendants
ROBERT WINSTON and JOHN FERRARO caused a purchase of
approximately 7,500 shares of Skynet stock at a price of
approximately $7.81 per share to be made in the account of
Customer No. 12.

gg.    On or about February 22, 2000, the defendant
JOHN FERRARO caused an unauthorized purchase of approximately
4,500 shares of CNFT stock at a price of approximately $6.00 per
share to be made in the account of a Montrose Capital customer
("Customer No. 13").

hh.    On or about February 22, 2000, the defendants
ROBERT WINSTON and JOHN FERRARO caused a purchase of
approximately 5,000 shares of CNFT stock at a price of
approximately $6.00 per share to be made in the account of a
Customer No. 12.

ii.    On or about March 10, 2000, the defendant
JOHN FERRARO caused a purchase of approximately 1,000 shares of
Skynet stock at a price of approximately $6.44 per share to be
made in the account of a Montrose Capital customer ("Customer No.
14").

jj.    On or about April 5, 2000, the defendant
JONATHAN WINSTON caused approximately 75,000 shares of Skynet

37

stock to be sold at approximately $5.74 per share from Fincord's account at Founders Equity.

(Title 18, United States Code, Sections 371 and 3551 <u>et seq</u>.)

COUNT TWO
(Securities Fraud - Ashton)

77.    The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

78.    In or about and between May 1996 and March 1998, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER, GREGG ADAMS, JAMES BILA, CHRISTIAN BLAKE, LOUIS FACCHINI, JR., DAVID HIRSCH, ROBERTO MANGIARANO, JOSEPH MANNINO, DAVID MARGULES, DAVID PESSO and ROBERT WINSTON, together with others, did knowingly and willfully, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants and others did knowingly and willfully, directly and indirectly, (a) employ devices, schemes, and artifices to defraud; (b) make untrue statements of material fact and omit to state material

38

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of the securities of Ashton, and by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT THREE
### (Securities Fraud - EquiMed)

79. The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

80. In or about and between August 1995 and April 1997, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER, GREGG ADAMS, JAMES BILA, CHRISTIAN BLAKE, LOUIS FACCHINI, JR., DAVID HIRSCH, ROBERTO MANGIARANO, JOSEPH MANNINO, DAVID MARGULES, DAVID PESSO and ROBERT WINSTON, together with others, did knowingly and willfully, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17,

Code of Federal Regulations, Section 240.10b-5), in that the

defendants and others did knowingly and willfully, directly and

indirectly, (a) employ devices, schemes, and artifices to

defraud; (b) make untrue statements of material fact and omit to

state material facts necessary in order to make the statements

made, in light of the circumstances under which they were made,

not misleading; and (c) engage in acts, practices, and courses of

business which would and did operate as a fraud and deceit upon

members of the investing public, in connection with purchases and

sales of the securities of EquiMed, and by use of means and

instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and

78ff; Title 18, United States Code, Sections 2 and 3551 <u>et seq</u>.)

COUNT FOUR
(Securities Fraud - National Medical)

81.   The allegations contained in paragraphs 1 through

76 are realleged and incorporated as if fully set forth herein.

82.   In or about and between August 1995 and April

1997, both dates being approximate and inclusive, within the

Eastern District of New York and elsewhere, the defendants

JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER,

GREGG ADAMS, JAMES BILA, CHRISTIAN BLAKE, LOUIS FACCHINI, JR.,

DAVID HIRSCH, ROBERTO MANGIARANO, JOSEPH MANNINO, DAVID MARGULES,

40

DAVID PESSO and ROBERT WINSTON, together with others, did
knowingly and willfully, directly and indirectly, use and employ
manipulative and deceptive devices and contrivances in violation
of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17,
Code of Federal Regulations, Section 240.10b-5), in that the
defendants and others did knowingly and willfully, directly and
indirectly, (a) employ devices, schemes, and artifices to
defraud; (b) make untrue statements of material fact and omit to
state material facts necessary in order to make the statements
made, in light of the circumstances under which they were made,
not misleading; and (c) engage in acts, practices, and courses of
business which would and did operate as a fraud and deceit upon
members of the investing public, in connection with purchases and
sales of the securities of National Medical, and by use of means
and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and
78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

### COUNT FIVE
(Securities Fraud - IRT Industries)

83.   The allegations contained in paragraphs 1 through
76 are realleged and incorporated as if fully set forth herein.

84.   In or about and between February 1997 and August
1997, both dates being approximate and inclusive, within the

41

Eastern District of New York and elsewhere, the defendants
JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER,
GREGG ADAMS, JAMES BILA, CHRISTIAN BLAKE, LOUIS FACCHINI, JR.,
DAVID HIRSCH, ROBERTO MANGIARANO, JOSEPH MANNINO, DAVID MARGULES,
DAVID PESSO and ROBERT WINSTON, together with others, did
knowingly and willfully, directly and indirectly, use and employ
manipulative and deceptive devices and contrivances in violation
of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17,
Code of Federal Regulations, Section 240.10b-5), in that the
defendants and others did knowingly and willfully, directly and
indirectly, (a) employ devices, schemes, and artifices to
defraud; (b) make untrue statements of material fact and omit to
state material facts necessary in order to make the statements
made, in light of the circumstances under which they were made,
not misleading; and (c) engage in acts, practices, and courses of
business which would and did operate as a fraud and deceit upon
members of the investing public, in connection with purchases and
sales of the securities of IRT Industries, and by use of means
and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Section 78j(b) and 78ff;
Title 18, United States Code, Sections 2 and 3551 et seq.)

42

## COUNT SIX
(Securities Fraud - Americom)

85.   The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

86.   In or about and between July 1998 and August 1999, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HUNTER ADAMS, GREGG ADAMS, ALAN BERKUN, JAMES BILA, LEONARD BILA, CHRISTIAN BLAKE, BRIAN CARROLL, JOSEPH DIGIROLAMO, JONATHAN DONESON, RUSSELL EHRENS, DAVID LAVENDER, ROBERT LISNOFF, ROBERTO MANGIARANO, JOSEPH MANNINO and ANTHONY SCALA, together with others, did knowingly and willfully, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants and others did knowingly and willfully, directly and indirectly, (a) employ devices, schemes, and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with

43

purchases and sales of the securities of Americom, and by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Section 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT SEVEN
(Securities Fraud - Global)

87.   The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

88.   In or about and between February 1999 and August 1999, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants HUNTER ADAMS, GREGG ADAMS, ALAN BERKUN, JAMES BILA, LEONARD BILA, CHRISTIAN BLAKE, BRIAN CARROLL, JOSEPH DIGIROLAMO, JONATHAN DONESON, RUSSELL EHRENS, DAVID LAVENDER, ROBERT LISNOFF, ROBERTO MANGIARANO, JOSEPH MANNINO and ANTHONY SCALA, together with others, did knowingly and willfully, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants and others did knowingly and willfully, directly and indirectly, (a) employ devices, schemes, and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make the

44

statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of the securities of Global, and by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Section 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT EIGHT
(Securities Fraud - Osage)

89.   The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

90.   In or about and between April 1998 and February 2001, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, ROBERT WINSTON and JOHN FERRARO, together with others, did knowingly and willfully, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants and others did knowingly and willfully, directly and indirectly, (a) employ devices, schemes, and artifices to defraud; (b) make untrue statements of material fact

45

and omit to state material facts necessary in order to make the
statements made, in light of the circumstances under which they
were made, not misleading; and (c) engage in acts, practices, and
courses of business which would and did operate as a fraud and
deceit upon members of the investing public, in connection with
purchases and sales of the securities of Osage, and by use of
means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Section 78j(b) and 78ff;
Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT NINE
(Securities Fraud - Skynet)

91.    The allegations contained in paragraphs 1 through
76 are realleged and incorporated as if fully set forth herein.

92.    In or about and between November 1998 and February
2001, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants
JONATHAN WINSTON, ROBERT WINSTON and JOHN FERRARO, together with
others, did knowingly and willfully, directly and indirectly, use
and employ manipulative and deceptive devices and contrivances in
violation of Rule 10b-5 of the Rules and Regulations of the SEC
(Title 17, Code of Federal Regulations, Section 240.10b-5), in
that the defendants and others did knowingly and willfully,
directly and indirectly, (a) employ devices, schemes, and

46

artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of the securities of Skynet, and by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Section 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT TEN
(Securities Fraud - CNFT)

93.    The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

94.    In or about and between November 1999 and February 2001, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, ROBERT WINSTON and JOHN FERRARO, together with others, did knowingly and willfully, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendants and others did knowingly and willfully,

-47

directly and indirectly, (a) employ devices, schemes, and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of the securities of CNFT, and by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Section 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNTS ELEVEN THROUGH THIRTEEN
### (Mail Fraud)

95.   The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

96.   In or about and between February 1994 and March 1998, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER, GREGG ADAMS, JAMES BILA and ROBERTO MANGIARANO, together with others, did knowingly and intentionally devise a scheme and artifice to defraud First United's and Lexington Capital's customers and other purchasers of Ashton and IRT stock, and to

48

obtain money and property from such customers and purchasers by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice and attempting to do so, caused a matter or thing to be deposited to be sent and delivered by the Postal Service, and by private or commercial interstate carrier, and caused such matter or thing to be delivered by mail or such carrier according to the direction thereon, and at the place at which it is directed to be delivered, as described below.

| COUNT | DATE | MAILING | TO | FROM |
|-------|------|---------|-----|------|
| ELEVEN | 11/11/96 | Confirmation Re. Purchase of 25,000 Shares of Ashton | Georgia | Garden City, New York |
| TWELVE | 6/20/97 | Confirmation Re. Purchase of 5,000 Shares of IRT | Florida | Hauppauge, New York |
| THIRTEEN | 7/31/97 | Confirmation Re. Purchase of 11,000 Shares of IRT | North Carolina | Garden City, New York |

(Title 18, United States Code, Sections 1341, 2 and 3551 et seq.)

## COUNTS FOURTEEN AND FIFTEEN
### (Wire Fraud)

97.    The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

49

98. In or about and between February 1994 and March 1998, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER, GREGG ADAMS, JAMES BILA and ROBERTO MANGIARANO, together with others, together with others, did knowingly and intentionally devise a scheme and artifice to defraud First United's and Lexington Capital's customers and other purchasers of Ashton and IRT stock, and to obtain money and property from such customers and purchasers by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice and attempting to do so, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce signs, signals, and sounds, as described below.

| COUNT | DATE | WIRE | TO | FROM |
|---|---|---|---|---|
| FOURTEEN | 11/11/96 | Telephone Call Re. Purchase of 25,000 Shares of Ashton | Georgia | Garden City, New York |
| FIFTEEN | 7/7/97 | Telephone Call Re. Purchase of 40,000 Shares of IRT | Ohio | Hauppauge, New York |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## COUNT SIXTEEN
(Conspiracy to Commit Money Laundering)

99.   The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

100.   In or about and between February 1994 and March 2001, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER, GREGG ADAMS, ALAN BERKUN, JONATHAN DONESON, RUSSELL EHRENS and ROBERTO MANGIARANO, together with others, did knowingly and intentionally conspire to conduct financial transactions affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to wit, securities, mail and wire fraud, knowing that the property involved in such financial transactions represented proceeds of some form of unlawful activity, (a) with the intent to promote the carrying on of the specified unlawful activity, and (b) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of such proceeds, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

51

## COUNT SEVENTEEN

(Conspiracy to Engage in Unlawful Monetary Transactions)

101.   The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

102.   In or about and between February 1994 and March 2001, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, JASON COHEN, HUNTER ADAMS, MICHAEL REITER, GREGG ADAMS, ALAN BERKUN, JONATHAN DONESON, RUSSELL EHRENS and ROBERTO MANGIARANO, together with others, did knowingly and intentionally conspire to engage in monetary transactions, in and affecting interstate and foreign commerce, in criminally derived property that was of a value of greater than $10,000 and was derived from specified unlawful activity, to wit, securities, mail and wire fraud, knowing that the property involved in such financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1957.

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## COUNTS EIGHTEEN THROUGH TWENTY-ONE
(Money Laundering)

103.   The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

.52

104.   On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS, together with others, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct financial transactions affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to wit, securities, mail and wire fraud, (a) with the intent to promote the carrying on of the specified unlawful activity and (b) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of such proceeds, in that the defendants transferred and caused to be transferred funds by wire and check in the approximate amounts listed below from JONATHAN WINSTON'S and JASON COHEN'S brokerage account at Smith Barney, account number 359-22655-10, into the banks listed below.

| COUNT | DATE | RECIPIENT BANK | CHECK/TRANSFER WIRE AMOUNT |
|-------|------|----------------|----------------------------|
| EIGHTEEN | 3/3/97 | EAB | $25,000 |
| NINETEEN | 3/7/97 | EAB | $65,000 |

53

| COUNT | DATE | RECIPIENT BANK | CHECK/TRANSFER WIRE AMOUNT |
|-------|------|----------------|----------------------------|
| TWENTY | 3/21/97 | Bank of NY | $2,000,000 |
| TWENTY-ONE | 4/11/97 | Chase Manhattan | $850,000 |

(Title 18, United States Code, Sections
1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

### COUNTS TWENTY-TWO THROUGH FORTY
(Unlawful Monetary Transactions)

105.    The allegations contained in paragraphs 1 through
76 are realleged and incorporated as if fully set forth herein.

106.    On or about the dates set forth below, within the
Eastern District of New York and elsewhere, the defendants
JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS, together with
others, knowingly and intentionally engaged in monetary
transactions in and affecting interstate and foreign commerce in
criminally derived property that was of a value of greater than
$10,000 and was derived from specified unlawful activity, to wit,
securities, mail and wire fraud, in that the defendants
transferred and caused to be transferred funds by wire and check
in the approximate amounts listed below from JONATHAN WINSTON'S
and JASON COHEN'S brokerage account at Smith Barney, account
number 359-22655-10, into the banks listed below.

| COUNT | DATE | RECIPIENT BANK | WIRE/CHECK AMOUNT |
|-------|------|----------------|-------------------|
| TWENTY-TWO | 1/31/97 | Chase Manhattan | $100,000 |

54

| COUNT | DATE | RECIPIENT BANK | WIRE/CHECK AMOUNT |
|---|---|---|---|
| TWENTY-THREE | 2/11/97 | Chase Manhattan | $50,000 |
| TWENTY-FOUR | 2/13/97 | Chase Manhattan | $25,000 |
| TWENTY-FIVE | 2/13/97 | Chase Manhattan | $50,000 |
| TWENTY-SIX | 2/14/97 | Chase Manhattan | $100,000 |
| TWENTY-SEVEN | 3/3/97 | EAB | $25,000 |
| TWENTY-EIGHT | 3/7/97 | Chase Manhattan | $60,000 |
| TWENTY-NINE | 3/7/97 | EAB | $65,000 |
| THIRTY | 3/19/97 | GreenPoint Bank | $75,000 |
| THIRTY-ONE | 3/25/97 | Chase Manhattan | $200,000 |
| THIRTY-TWO | 3/25/97 | Chase Manhattan | $25,000 |
| THIRTY-THREE | 3/25/97 | Chase Manhattan | $40,000 |
| THIRTY-FOUR | 3/27/97 | Chase Manhattan | $150,000 |
| THIRTY-FIVE | 3/27/97 | Chase Manhattan | $150,000 |
| THIRTY-SIX | 3/27/97 | Chase Manhattan | $25,000 |
| THIRTY-SEVEN | 4/10/97 | Chase Manhattan | $67,000 |
| THIRTY-EIGHT | 4/10/97 | Chase Manhattan | $67,000 |
| THIRTY-NINE | 4/10/97 | EAB | $75,000 |
| FORTY | 4/10/97 | GreenPoint Bank | $500,000 |

(Title 18, United States Code, Sections 1957, 2 and

3551 et seq.)

### COUNTS FORTY-ONE THROUGH FORTY-FIVE
(Unlawful Monetary Transactions)

107.   The allegations contained in paragraphs 1 through

76 are realleged and incorporated as if fully set forth herein.

108.   On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS, together with others, knowingly and intentionally engaged in monetary transactions in and affecting interstate and foreign commerce in criminally derived property that was of a value of greater than $10,000 and was derived from specified unlawful activity, to wit, securities, mail and wire fraud, in that the defendants transferred and caused to be transferred funds by wire and check in the approximate amounts listed below from the Avalon account at First United into the bank listed below.

| COUNT | DATE | RECIPIENT BANK | WIRE/CHECK AMOUNT |
|-------|------|----------------|-------------------|
| FORTY-ONE | 2/6/97 | EAB | $25,000 |
| FORTY-TWO | 3/19/97 | EAB | $50,000 |
| FORTY-THREE | 6/19/97 | EAB | $30,000 |
| FORTY-FOUR | 7/24/97 | EAB | $20,000 |
| FORTY-FIVE | 9/11/97 | EAB | $176,000 |

(Title 18, United States Code, Sections 1957, 2 and 3551 et seq.)

56

## COUNTS FORTY-SIX AND FORTY-SEVEN
(Money Laundering)

109.  The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

110.  On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendants JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS, together with others, did knowingly and intentionally transmit and transfer funds from a place in the United States to and through a place outside the United States, knowing that the funds involved in the transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transmission and transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in that the defendants transferred and caused to be transferred funds by wire and check in the approximate amounts listed below from the E.M.R.A. account at First United into the banks listed below.

| COUNT | DATE | RECIPIENT BANK | CHECK/WIRE AMOUNT |
|-------|------|----------------|-------------------|
| FORTY-SIX | 7/23/97 | Lloyd's Bank PLC | $550,000 |

57

| COUNT | DATE | RECIPIENT BANK | CHECK/WIRE AMOUNT |
|-------|------|----------------|-------------------|
| FORTY-SEVEN | 8/27/97 | Israel Discount | $158,576.64 |

(Title 18, United States Code, Sections
1956(a)(2)(B)(i), 2 and 3551 et seq.)

## COUNTS FORTY-EIGHT AND FORTY-NINE
### (Money Laundering)

111.   The allegations contained in paragraphs 1 through
76 are realleged and incorporated as if fully set forth herein.

112.   On or about the dates set forth below, within the
Eastern District of New York and elsewhere, the defendants
JONATHAN WINSTON, JASON COHEN and HUNTER ADAMS, together with
others, together with others, did knowingly and intentionally
transmit and transfer funds from a place in the United States to
and through a place outside the United States, knowing that the
funds involved in the transmission and transfer represented the
proceeds of some form of unlawful activity, and knowing that such
transmission and transfer was designed in whole or in part to
conceal or disguise the nature, the location, the source, the
ownership, and the control of the proceeds of specified unlawful
activity, in that the defendants transferred and caused to be
transferred funds by wire and check in the approximate amounts

58

listed below from the Univest account at First United into the bank listed below.

| COUNT | DATE | RECIPIENT BANK | CHECK/WIRE AMOUNT |
|-------|------|----------------|-------------------|
| FORTY-EIGHT | 7/10/97 | Lloyds Bank PLC | $602,000 |
| FORTY-NINE | 9/23/97 | Lloyds Bank PLC | $98,038.26 |

(Title 18, United States Code, Sections 1956(a)(2)(B)(i), 2 and 3551 et seq.)

### COUNTS FIFTY THROUGH FIFTY-THREE
(Money Laundering)

113. The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

114. On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendant MICHAEL REITER, together with others, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct financial transactions affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to wit, securities, mail and wire fraud, (a) with the intent to promote the carrying on of the specified unlawful activity and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location,

59

source, ownership and control of such proceeds, in that the

defendant transferred and caused to be transferred funds by wire

and check in the approximate amounts listed below from Apollo's

account at Citibank into the bank listed below.

| COUNT | DATE | RECIPIENT BANK | CHECK/WIRE AMOUNT |
|-------|------|----------------|-------------------|
| FIFTY | 8/7/97 | Chase Manhattan | $150,000 |
| FIFTY-ONE | 9/3/97 | Chase Manhattan | $250,000 |
| FIFTY-TWO | 11/6/97 | Chase Manhattan | $300,000 |
| FIFTY-THREE | 12/22/97 | Chase Manhattan | $250,000 |

(Title 18, United States Code, Sections

1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

### COUNT FIFTY-FOUR
(Money Laundering)

115.   The allegations contained in paragraphs 1 through

76 are realleged and incorporated as if fully set forth herein.

116.   On or about September 17, 1996, within the

Eastern District of New York and elsewhere, the defendant ROBERTO

MANGIARANO, together with others, knowing that the property

involved in a financial transaction represented the proceeds of

some form of unlawful activity, did knowingly and intentionally

conduct financial transactions affecting interstate and foreign

60

commerce which in fact involved the proceeds of specified

unlawful activity, to wit, securities, mail and wire fraud, (a)

with the intent to promote the carrying on of the specified

unlawful activity and (b) knowing that the transactions were

designed in whole or in part to conceal and disguise the nature,

location, source, ownership and control of such proceeds, in that

the defendant transferred and caused to be transferred $25,000 in

funds by wire from a nominee's account at Bank of New York into

the defendant ROBERTO MANGIARANO's bank account at Bank of New

York.

(Title 18, United States Code, Sections
1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

### COUNTS FIFTY-FIVE THROUGH FIFTY-SIX
(Money Laundering)

117.   The allegations contained in paragraphs 1 through
76 are realleged and incorporated as if fully set forth herein.

118.   On or about the dates set forth below, within the
Eastern District of New York and elsewhere, the defendants HUNTER
ADAMS and ALAN BERKUN, together with others, knowing that the
property involved in financial transactions represented the
proceeds of some form of unlawful activity, did knowingly and
intentionally conduct financial transactions affecting interstate
and foreign commerce which in fact involved the proceeds of

61

specified unlawful activity, to wit, securities, mail and wire fraud, (a) with the intent to promote the carrying on of the specified unlawful activity and (b) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of such proceeds, in that the defendants transferred and caused to be transferred funds by wire and check in the approximate amounts listed below from BERKUN's account at Patterson Travis into an account in the name of EJR Associates at the bank listed below.

| COUNT | DATE | RECIPIENT BANK | CHECK/TRANSFER WIRE AMOUNT |
|---|---|---|---|
| FIFTY-FIVE | 7/01/99 | Chase | $392,006.69 |
| FIFTY-SIX | 7/16/99 | Chase | $721,212.43 |
| FIFTY-SEVEN | 9/1/99 | Chase | $71,507.00 |
| FIFTY-EIGHT | 10/15/99 | Chase | $10,294.15 |

(Title 18, United States Code, Sections
1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

## COUNTS FIFTY-NINE THROUGH SIXTY-TWO
(Money Laundering)

119.  The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

120.  On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendant HUNTER ADAMS, together with others, knowing that the property involved

62

in financial transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct financial transactions affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to wit, securities, mail and wire fraud, (a) with the intent to promote the carrying on of the specified unlawful activity and (b) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of such proceeds, in that the defendant transferred and caused to be transferred funds by wire in the approximate amounts listed below from HUNTER ADAMS' account at Pacific International, in the name of SMS Holdings, into an account in the name of Americom at the bank listed below.

| COUNT | DATE | RECIPIENT BANK | WIRE AMOUNT |
|-------|------|----------------|-------------|
| FIFTY-NINE | 1/15/99 | Chase | $50,000 |
| SIXTY | 1/28/99 | Chase | $50,000 |
| SIXTY-ONE | 2/5/99 | Chase | $50,000 |
| SIXTY-TWO | 3/2/99 | Chase | $60,000 |

(Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

63

## COUNTS SIXTY-THREE AND SIXTY-FOUR
(Money Laundering)

121.   The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

122.   On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendants GREGG ADAMS and ALAN BERKUN, together with others, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct financial transactions affecting interstate and foreign commerce which in fact involved the proceeds of specified unlawful activity, to wit, securities, mail and wire fraud, (a) with the intent to promote the carrying on of the specified unlawful activity and (b) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of such proceeds, in that the defendants transferred and caused to be transferred funds by wire and check in the approximate amounts listed below from accounts at Chase, in BERKUN's name and the name of EJR

64

Associates, into GREGG ADAMS's account, in the name of Marlowe

Holding Co., at the bank listed below.

| COUNT | DATE | RECIPIENT BANK | CHECK/TRANSFER WIRE AMOUNT |
|-------|------|----------------|----------------------------|
| SIXTY-THREE | 8/28/98 | Bank of NY | $70,000 |
| SIXTY-FOUR | 4/8/99 | Bank of NY | $261,975 |

(Title 18, United States Code, Sections
1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

## COUNTS SIXTY-FIVE THROUGH EIGHTY-SIX
### (Unlawful Monetary Transactions)

123.   The allegations contained in paragraphs 1 through
76 are realleged and incorporated as if fully set forth herein.

124.   On or about the dates set forth below, within the
Eastern District of New York and elsewhere, the defendants HUNTER
ADAMS and ALAN BERKUN, together with others, together with
others, knowingly and intentionally engaged in monetary
transactions in and affecting interstate and foreign commerce in
criminally derived property that was of a value of greater than
$10,000 and was derived from specified unlawful activity, to wit,
securities, mail and wire fraud, in that the defendants
transferred and caused to be transferred funds by wire and check
in the approximate amounts listed below from BERKUN's brokerage
account at Gruntal & Co., into accounts, in BERKUN's name and the

65



name of EJR Associates, at the banks listed below.

| COUNT | DATE | RECIPIENT BANK | CHECK/TRANFER WIRE AMOUNT |
|-------|------|----------------|---------------------------|
| SIXTY-FIVE | 2/5/99 | Chase Manhattan | $42,416.17 |
| SIXTY-SIX | 3/22/99 | Chase Manhattan | $15,000 |
| SIXTY-SEVEN | 3/23/99 | Chase Manhattan | $30,000 |
| SIXTY-EIGHT | 3/23/99 | Chase Manhattan | $52,000 |
| SIXTY-NINE | 3/25/99 | Chase Manhattan | $25,000 |
| SEVENTY | 3/29/99 | Chase Manhattan | $286,250 |
| SEVENTY-ONE | 3/29/99 | Chase Manhattan | $35,000 |
| SEVENTY-TWO | 3/31/99 | Chase Manhattan | $41,000 |
| SEVENTY-THREE | 4/1/99 | Chase Manhattan | $50,000 |
| SEVENTY-FOUR | 4/5/99 | Chase Manhattan | $262,000 |
| SEVENTY-FIVE | 4/30/99 | HSBC | $156,279 |
| SEVENTY-SIX | 5/5/99 | HSBC | $151,200 |
| SEVENTY-SEVEN | 5/11/99 | HSBC | $269,045 |
| SEVENTY-EIGHT | 5/12/99 | HSBC | $115,567 |
| SEVENTY-NINE | 5/13/99 | HSBC | $82,000 |
| EIGHTY | 5/14/99 | HSBC | $127,958 |
| EIGHTY-ONE | 5/17/99 | HSBC | $38,000 |
| EIGHTY-TWO | 5/18/99 | HSBC | $55,551 |
| EIGHTY-THREE | 5/19/99 | HSBC | $52,613 |
| EIGHTY-FOUR | 5/27/99 | HSBC | $44,208 |
| EIGHTY-FIVE | 6/2/99 | HSBC | $10,833 |
| EIGHTY-SIX | 9/9/99 | HSBC | $235,374 |

Title 18, United States Code, Sections 1957, 2 and 3551

et seq.)

66



## COUNTS EIGHTY-SEVEN THROUGH EIGHTY-NINE
(Unlawful Monetary Transactions)

125.   The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

126.   On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendant ALAN BERKUN, together with others, knowingly and intentionally engaged in monetary transactions in and affecting interstate and foreign commerce in criminally derived property that was of a value of greater than $10,000 and was derived from specified unlawful activity, to wit, securities, mail and wire fraud, in that the defendant transferred and caused to be transferred funds by wire and check in the approximate amounts listed below from ALAN BERKUN's Chase account to a collectable stamp dealer for the purchase of rare stamps.

| COUNT | DATE | CHECK NUMBER | CHECK AMOUNT |
|-------|------|--------------|--------------|
| EIGHTY-SEVEN | 10/16/98 | #2592 | $12,000 |
| EIGHTY-EIGHT | 11/15/98 | #2610 | $12,000 |
| EIGHTY-NINE | 12/8/98 | #2643 | $12,000 |

Title 18, United States Code, Sections 1957, 2 and 3551 et seq.)

67

## COUNTS NINETY AND NINETY-ONE
(Money Laundering)

127.  The allegations contained in paragraphs 1 through
76 are realleged and incorporated as if fully set forth herein.

128.  On or about the dates set forth below, within the
Eastern District of New York and elsewhere, the defendant ALAN
BERKUN, together with others, together with others, did knowingly
and intentionally transmit and transfer funds from a place in the
United States to and through a place outside the United States,
knowing that the funds involved in the transmission and transfer
represented the proceeds of some form of unlawful activity, and
knowing that such transmission and transfer was designed in whole
or in part to conceal or disguise the nature, the location, the
source, the ownership, and the control of the proceeds of
specified unlawful activity, in that the defendant transferred
and caused to be transferred funds by wire and check in the
approximate amounts listed below from BERKUN's Chase account into
an account that BERKUN controlled, in the name of Bran Limited,
at the bank listed below.

| COUNT | DATE | RECIPIENT BANK | CHECK/WIRE AMOUNT |
|-------|------|----------------|-------------------|
| NINETY | 8/25/98 | Hambros Bank | $125,000 |

68

| COUNT | DATE | RECIPIENT BANK | CHECK/WIRE AMOUNT |
|-------|------|----------------|-------------------|
| NINETY-ONE | 1/25/99 | Hambros Bank | $108,200 |

(Title 18, United States Code, Sections

1956(a)(2)(B)(i), 2 and 3551 et seq.)

## COUNTS NINETY-TWO AND NINETY-THREE
### (Money Laundering)

129. The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

130. On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendant ALAN BERKUN, together with others, together with others, did knowingly and intentionally transmit and transfer funds from a place in the United States to and through a place outside the United States, knowing that the funds involved in the transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transmission and transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in that the defendant transferred and caused to be transferred funds by wire and check in the approximate amounts listed below from an account at Chase, in the name EJR Associates, into an account, in the name of Bran Limited, at the bank listed below.

69

| COUNT | DATE | RECIPIENT BANK | CHECK/WIRE AMOUNT |
|-------|------|----------------|-------------------|
| NINETY-TWO | 7/21/99 | Hambros Bank | $139,469.76 |
| NINETY-THREE | 9/21/99 | Hambros Bank | $180,000 |

(Title 18, United States Code, Sections
1956(a)(2)(B)(i), 2 and 3551 et seq.)

## COUNTS NINETY-FOUR THROUGH NINETY-SIX
(Money Laundering)

131.    The allegations contained in paragraphs 1 through
76 are realleged and incorporated as if fully set forth herein.

132.    On or about the dates set forth below, within the
Eastern District of New York and elsewhere, defendants HUNTER
ADAMS and ALAN BERKUN, together with others, did knowingly and
intentionally transmit and transfer funds from a place in the
United States to and through a place outside the United States,
(a) with the intent to promote the carrying on of specified
unlawful activity and (b) knowing that the funds involved in the
transmission and transfer represented the proceeds of some form
of unlawful activity, and knowing that such transmission and
transfer was designed in whole or in part to conceal or disguise
the nature, the location, the source, the ownership, and the
control of the proceeds of specified unlawful activity, in that
the defendants transferred and caused to be transferred funds by
wire and check in the approximate amounts listed below from

70

BERKUN's account at HSBC into a foreign account at the bank listed below.

| COUNT | DATE | RECIPIENT BANK | WIRE AMOUNT |
|-------|------|----------------|-------------|
| NINETY-FOUR | 5/19/99 | UBS AG, ZURICH | $300,000 |
| NINETY-FIVE | 5/21/99 | UBS AG, ZURICH | $200,000 |
| NINETY-SIX | 8/3/99 | UBS AG, ZURICH | $161,800 |

(Title 18, United States Code, Sections 1956(a)(2)(B)(i), 2 and 3551 et seq.)

### COUNT NINETY-SEVEN
(Money Laundering)

133.   The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

134.   On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendants HUNTER ADAMS and ALAN BERKUN, together with others, did knowingly and intentionally transmit and transfer funds from a place in the United States to and through a place outside the United States, (a) with the intent to promote the carrying on of specified unlawful activity and (b) knowing that the funds involved in the transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transmission and transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the

71

control of the proceeds of specified unlawful activity, in that

the defendants transferred and caused to be transferred funds by

wire and check in the approximate amounts listed below from an

account at Chase, in the name of EJR Associates, into a foreign

account at the bank listed below.

| COUNT | DATE | RECIPIENT BANK | CHECK/WIRE AMOUNT |
|-------|------|----------------|-------------------|
| NINETY-SEVEN | 7/19/99 | UBS AG, Zurich | $983,000 |

Title 18, United States Code, Sections

1956(a)(2)(B)(i), 2 and 3551 et seq.)

## COUNTS NINETY-EIGHT AND NINETY-NINE
(Money Laundering)

135.   The allegations contained in paragraphs 1 through

76 are realleged and incorporated as if fully set forth herein.

136.   On or about the dates set forth below, within the

Eastern District of New York and elsewhere, the defendant

JONATHAN WINSTON, together with others, knowing that the property

involved in financial transactions represented the proceeds of

some form of unlawful activity, did knowingly and intentionally

conduct financial transactions affecting interstate and foreign

commerce which in fact involved the proceeds of specified

unlawful activity, to wit, securities, mail and wire fraud, (a)

with the intent to promote the carrying on of the specified

unlawful activity and (b) knowing that the transactions were

72

designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of such proceeds, in that the defendants transferred and caused to be transferred funds by wire and check in the approximate amounts listed below from Fincord Holding Corp's account at Bear Stearns into an account in the name of Fincord Holding Corp. at the bank listed below.

| COUNT | DATE | RECIPIENT BANK | CHECK/TRANSFER WIRE AMOUNT |
|-------|------|----------------|----------------------------|
| NINETY-EIGHT | 12/21/99 | Commercial Bank of NY | $648,000 |
| NINETY-NINE | 12/23/99 | Commercial Bank of NY | $731,468 |

(Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

## COUNTS ONE-HUNDRED THROUGH ONE-HUNDRED THREE
(Money Laundering)

137.  The allegations contained in paragraphs 1 through 76 are realleged and incorporated as if fully set forth herein.

138.  On or about the dates set forth below, within the Eastern District of New York and elsewhere, the defendant JONATHAN WINSTON, together with others, knowing that the property involved in financial transactions represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct financial transactions affecting interstate and foreign commerce which in fact involved the proceeds of specified

73

unlawful activity, to wit, securities, mail and wire fraud, (a)
with the intent to promote the carrying on of the specified
unlawful activity and (b) knowing that the transactions were
designed in whole or in part to conceal and disguise the nature,
location, source, ownership and control of such proceeds, in that
the defendants transferred and caused to be transferred funds by
wire and check in the approximate amounts listed below from
Fincord Holding Corp's account at Founder's Equity Group into an
account in the name of Fincord Holding Corp. at the bank listed
below.

| COUNT | DATE | RECIPIENT BANK | CHECK/TRANSFER WIRE AMOUNT |
|-------|------|----------------|----------------------------|
| ONE-HUNDRED | 4/14/00 | Commercial Bank of NY | $613,383 |
| ONE-HUNDRED ONE | 4/26/00 | Commercial Bank of NY | $54,680 |
| ONE-HUNDRED TWO | 5/24/00 | Commercial Bank of NY | $73,763 |
| ONE-HUNDRED THREE | 6/21/00 | Commercial Bank of NY | $53,341 |

(Title 18, United States Code, Sections

1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 2 and 3551 et seq.)

## FORFEITURE ALLEGATION I

139.  The allegations contained in Counts Sixteen and Seventeen are hereby realleged and incorporated as if fully set forth herein for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982.

140.  Pursuant to Title 18, United States Code, Section 982(a)(1), each defendant who is convicted of either of the offenses set forth in Counts 16 and 17 of this Superseding Indictment shall forfeit to the United States the following property: All right, title, and interest in any and all property, real and personal, involved in the conspiracy offenses described in each of these counts for which the defendant is convicted, in violation of Title 18, United States Code, Sections 1956 and 1957, and all property traceable to such property, including, but not limited to, the following: (a) all money and other property that was the subject of the money laundering conspiracies alleged in Counts 16 and 17, in violation of Title 18, United States Code, Sections 1956 and 1957; (b) all commissions, fees and other property obtained as a result of those violations; and (c) all property used in any manner or part to commit or to facilitate the commission of those violations.

141.  The value of the property subject to forfeiture described in the foregoing paragraph is approximately

75

$100,000,000, and includes, but is not limited to, the defendants' right, title and interest in the following:

a.   the premises and real property located at 401 East 60th Street, Unit 12D, New York, New York (the "401 East 60th Street condominium");

b.   the premises and real property located at 1954 Bay Boulevard, Atlantic Beach, New York (the "1954 Bay Boulevard property");

c.   the premises and real property located at 7000 Island Boulevard, PH-01, Aventura, Florida 33160 (the "7000 Island Boulevard condominium");

d.   a 54 foot, 6 inch fiberglass hull 1999 self-propelled vessel, bearing registration number D1090285, named the "Patrician" (the "Patrician vessel");

e.   funds in the approximate sum of $1,500,000.00 on deposit in Barclays Bank, Douglas, Isle of Man, in an account in the name of Plasm Settlement, which is administered by Stuart Smalley & Co., and which is part of the Hatteras Settlement; the defendant JONATHAN WINSTON is the settlor for the Plasm Settlement (the "Plasm Settlement funds");

f.   funds in the approximate sum of $1,250,000.00 in English pounds sterling and $6,000 Canadian dollars held as part of the Hatteras Settlement which is administered by Stuart

76

Smalley & Co., and which is located within the Isle of Man (the "Hatteras Settlement funds").

142.   If more than one defendant is convicted of the offenses alleged in Counts 16 and 17, the defendants so convicted are jointly and severally liable for the value of all property involved in such offenses, and all property traceable to such property.

143.   If, by any act or omission of any of the defendants, any of the property described in paragraphs 140 and 141 above, or any portion thereof;

   a.   cannot be located upon the exercise of due diligence;

   b.   has been transferred, or sold to or deposited with a third party;

   c.   has been placed beyond the jurisdiction of the Court;

   d.   has been substantially diminished in value; or

   e.   has been commingled with other property which cannot be   divided without difficulty;

the defendant shall forfeit substitute property, up to the value of the property described in sub-paragraphs 143(a) through 143(e) above, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b).

144. The substitute property identified in the foregoing paragraph includes, but is not limited to, all right, title and interest in the premises and real property located at 2329 Halyard Drive, Merrick, New York.

(Title 18, United States Code, Section 981; Title 21, United States Code, Section 853.)

## FORFEITURE ALLEGATION II

145. The allegations contained in Counts Eighteen through One-Hundred Three are hereby realleged and incorporated as if fully set forth herein for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 982.

146. Pursuant to Title 18, United States Code, Section 982(a)(1), any of the defendants who are convicted of the offenses alleged in Counts Eighteen through One-Hundred Three, in violation of Title 18, United States Code, Sections 1956 and 1957, shall forfeit to the United States all property, real and personal, involved in the offenses alleged in those Counts, and all property traceable to such property, including, but not limited to, the following: (a) all money and other property that was the subject of the money laundering conspiracies alleged in Counts 16 and 17, in violation of Title 18, United States Code, Sections 1956 and 1957; (b) all commissions, fees and other

78

property obtained as a result of those violations; and (c) all
property used in any manner or part to commit or to facilitate
the commission of those violations.

147.  The property subject to forfeiture in the
foregoing paragraph includes, but is not limited to, the
defendants' right, title and interest in the following:

a.  the premises and real property located at 401
East 60th Street, Unit 12D, New York, New York (the "401 East 60th
Street condominium");

b.  the premises and real property located at 1954
Bay Boulevard, Atlantic Beach, New York (the "1954 Bay Boulevard
property");

c.  the premises and real property located at 7000
Island Boulevard, PH-01, Aventura, Florida 33160 (the "7000
Island Boulevard condominium");

d.  a 54 foot, 6 inch fiberglass hull 1999 self-
propelled vessel, bearing registration number D1090285, named the
"Patrician" (the "Patrician vessel");

e.  funds in the approximate sum of $1,500,000.00
on deposit in Barclays Bank, Douglas, Isle of Man, in an account
in the name of Plasm Settlement, which is administered by Stuart
Smalley & Co., and which is part of the Hatteras Settlement; the

79

defendant JONATHAN WINSTON is the settlor for the Plasm Settlement (the "Plasm Settlement funds");

f. funds in the approximate sum of $1,250,000.00 in English pounds sterling and $6,000 Canadian dollars held as part of the Hatteras Settlement which is administered by Stuart Smalley & Co., and which is located within the Isle of Man (the "Hatteras Settlement funds").

148. Any of the defendants named in Counts Eighteen through One-Hundred Three who are convicted of those Counts shall be jointly and severally liable for forfeiture of an amount equal to the money alleged in the count for which said defendant is convicted, and all property traceable thereto.

149. If, by any act or omission of any of the defendants, any of the property described in paragraphs 146 and 147, or any portion thereof;

> a. cannot be located upon the exercise of due diligence;
>
> b. has been transferred, or sold to or deposited with a third party;
>
> c. has been placed beyond the jurisdiction of the Court;
>
> d. has been substantially diminished in value; or
>
> e. has been commingled with other property which cannot be divided without difficulty;

80

the defendant shall forfeit substitute property, up to the value

of the property described in sub-paragraphs 149(a) through 149(e)

above, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 18, United States Code, Section 982(b).

150.   The substitute property identified in the

foregoing paragraph includes, but is not limited to, all right,

title and interest in the premises and real property located at

2329 Halyard Drive, Merrick, New York.

(Title 18, United States Code, Section 981; Title 21,

United States Code, Section 853.)

A TRUE BILL

_____
FOREPERSON

ALAN VINEGRAD
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

81